903 F.2d 844
 284 U.S.App.D.C. 226
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America,
v.
Clarence JOHNSON, Appellant.
 No. 88-3121.
 United States Court of Appeals, District of Columbia Circuit.
 June 1, 1990.
 
 Before D.H. GINSBURG and SENTELLE, Circuit Judges, and SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record on appeal from the United States District Court for the District of Columbia, and was argued by counsel. The court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 14(c). It is
 
 
 2
 ORDERED and ADJUDGED that the judgment of conviction be and hereby is affirmed for the reasons stated in the accompanying memorandum.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15(b)(2).
 
 MEMORANDUM
 
 4
 Clarence Johnson was convicted pursuant to 21 U.S.C. Sec. 841(a) (1982) of possessing cocaine with intent to distribute. He now asserts that the evidence underpinning the conviction was illegally obtained. His principal argument is that he was "seized" in violation of the Fourth Amendment, and that the unlawful nature of the seizure tainted that evidence, which was uncovered upon a subsequent consent search. Alternatively, Johnson contends that his "consent" was without effect because it was involuntary.
 
 
 5
 Johnson's encounter with the law occurred shortly after 10:10 on a February morning as Detectives Hanson and Beard of the Metropolitan Police Department, in coordination with Special Agent Sauve of Amtrak, conducted random "interviews" of passengers alighting from an Amtrak train in Washington's Union Station. The train had left New York at 6:30 that morning, and the officers' "intention [was] to ... ferret out those drug couriers that [were] using" Amtrak to transport drugs. All three officers were dressed casually in suits without ties, and their weapons remained concealed at all times. When Sauve felt that someone should be questioned, he signaled one of the other officers, who approached the passenger for that purpose.
 
 
 6
 Johnson attracted Sauve's attention because he wore expensive casual clothing, including a full-length padded-down jacket, and carried a single nylon bag as his only luggage. Johnson also appeared nervous, and markedly so after he saw Beard searching another passenger's luggage, the contents of which were spread out on the floor. When Johnson then began to look around for other exits, Sauve gave Hanson the signal to quiz.
 
 
 7
 Hanson approached Johnson, exhibited his badge, identified himself and said in a normal tone of voice, "Police officer, may I talk with you a moment?" Johnson replied, "Sure, Okay." On request, Johnson produced the stubs of his spent round-trip tickets between Washington and New York, which Hanson examined and promptly returned. Hanson explained that he "was part of the narcotics branch drug interdiction unit and that part of [his] job was to talk with people coming into the city from source-cities such as Miami and Chicago[.]" He asked Johnson "if he was aware of the major drug problem that existed in Washington," and Johnson answered in the affirmative. Hanson then asked if Johnson "would mind" if he searched his bag. Johnson responded, "Sure, no problem" and handed the bag to Hanson. Inside the bag, Hanson discovered cocaine and drug-peddling paraphanelia. He then informed Johnson that he was under arrest, and Sauve, who stood nearby throughout the encounter, handcuffed him.
 
 
 8
 The District Court denied Johnson's motion to suppress this evidence,[1] concluding that Johnson had not been "seized" within the meaning of the Fourth Amendment, and that he had consented to the search of his bag. Transcript of Motions Hearing (May 27, 1988) 81-88. On a motion to suppress evidence as illegally obtained, we accept the District Court's factual findings when not clearly erroneous, e.g., United States v. Thomas, 864 F.2d 843, 846 (D.C.Cir.1989), and, indeed, the pertinent facts of this case are undisputed. But the ultimate inquiry--whether, on the facts conceded or found, there was a Fourth Amendment seizure--is a question of law determinable de novo by this court. United States v. Maragh, 894 F.2d 415, 417-418 (D.C.Cir.1990).
 
 
 9
 Johnson maintains that "a reasonable person would conclude that a newcomer to the law, after observing the stopping and searching of the luggage of another at an exit he must pass and immediately confronted by a police officer and subject to a barrage of questions for 3-5 minutes, would believe that police detention and search was inevitable and that he had no voluntary choice to preclude such." Brief for Appellant at 11. The essentially uncontroverted factual record, however, leads us to the opposite conclusion.
 
 
 10
 Detective Hanson approached Johnson in the station concourse, an open area. He requested conversation, but did not order it; he neither directed nor restrained Johnson's activity in any way. Hanson, in plain clothes, identified himself, spoke politely, kept his weapon concealed, and returned Johnson's ticket stubs after briefly examining them. In asking about Johnson's traveling, he was brief and to the point. We share the District Court's view that the events immediately preceding Johnson's arrest did not amount to a Fourth Amendment seizure.
 
 
 11
 We believe, moreover, that the fact that Detective Beard was searching another passenger's luggage at the time Johnson was approached would not lead a reasonable law-abiding person to doubt his freedom to ignore a policeman's importunity to talk, and to instead continue on his way. There was no indication that the search in progress was other than consensual, or that a search of Johnson's own bag was inevitable. See United States v. Brady, 842 F.2d 1313, 1315 n. 3 (D.C.Cir.1988) ("a reasonable person is not assumed to have a guilty mind, which is especially prone to apprehensions of confinement"); Gomez v. Turner, 672 F.2d 134, 141-142 (D.C.Cir.1982) (guiltless citizens often cooperate with police by consenting to searches designed to uncover illegal activity). The only inference objectively deducible from the other search is that police officers were present and looking for something, and that would hardly visit any significant amount of anxiety upon a reasonable person innocent of any crime. The witnessed search might have taken on a different cast under other circumstances--for example, overt coercion in carrying it out--but nothing of that sort appeared here. We therefore agree with the District Court that the challenged events amounted to no more than "the sort of consensual encounter that implicates no Fourth Amendment interest." Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984) (per curiam).
 
 
 12
 Nor have we been given reason to upset the District Court's finding that Johnson consented to the search of his bag. The standard for evaluating the validity of consent is voluntariness under the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 223 (1973). The "ultimate determination by a trial judge at a suppression hearing as to the issue of consent, whether it be consent to enter or consent to search, is factual in nature [and] [a]s such ... that determination must remain untouched on appeal unless it is 'clearly erroneous.' " United States v. Sheard, 473 F.2d 139, 146 (D.C.Cir.1972).
 
 
 13
 Johnson insists that his consent was involuntary because, he says, it was not knowingly and intelligently given. More specifically, he argues that no person "in his right mind is going to voluntarily consent to ... a search for drugs, where discovery is certain, if he actually knows he has the right not to consent...." Brief for Appellant at 11. But both the Supreme Court and this court have recognized that people cooperate with the police for a variety of reasons. E.g., United States v. Mendenhall, 446 U.S. 544, 559 n. 7 (Stewart, J., concurring) (respondent who twice consented to a strip search "may have thought she was acting in her self-interest, by voluntarily cooperating with the officers in the hope of receiving more lenient treatment"); Gomez v. Turner, supra, 672 F.2d at 141-142. And the Supreme Court has expressly declined to impose on police an obligation to advise the subject of a search of his right to refuse to consent. Schneckloth v. Bustamonte, supra, 412 U.S. at 231. Accordingly, we perceive no basis for distinguishing this case from a host of others in which drug couriers reacted to a search exactly as Johnson did. E.g., Schneckloth v. Bustamonte, supra, 412 U.S. at 220; United States v. Brady, supra, 842 F.2d at 1314; United States v. Joseph, 892 F.2d 118, 120 (D.C.Cir.1989).
 
 
 
 [1]
 Johnson also sought unsuccessfully to suppress, as fruit of the poisonous tree, two incriminating statements he made to the police after he was formally arrested